| Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number | FOR COURT USE ONLY |
|---|---|
| Leib M. Lerner (227323)<br>ALSTON & BIRD LLP<br>333 S. Hope Street, 16th Floor<br>Los Angeles, CA 90071<br>(213) 576-1000<br>(213) 576-1100<br>leib.lerner@alston.com<br>☐ *Individual appearing without counsel*<br>☒ *Attorney for:* Holiday Hospitality Franchising, Inc. | |

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA**

| In re:<br>CHOA Vision, LLC<br><br><br><br>Debtor(s). | CHAPTER: 11 |
|---|---|
| | CASE NO.: 10-44798 RN |
| | DATE:    March 8, 2011<br>TIME:    9:00 am<br>CTRM:    1645<br>FLOOR: |

## NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY
### UNDER 11 U.S.C. § 362 (with supporting declarations)
### (MOVANT: HOLIDAY HOSPITALITY FRANCHISING, INC.)
### (Personal Property)

1. NOTICE IS HEREBY GIVEN to the Debtor(s) and Trustee (if any)("Responding Parties"), their attorneys (if any), and other interested parties that on the above date and time and in the indicated courtroom, Movant in the above-captioned matter will move this Court for an Order granting relief from the automatic stay as to Debtor(s) and Debtor's(s') bankruptcy estate on the grounds set forth in the attached Motion.

2. **Hearing Location:**   ☒ **255 East Temple Street, Los Angeles**     ☐ **411 West Fourth Street, Santa Ana**
   ☐ **21041 Burbank Boulevard, Woodland Hills**     ☐ **1415 State Street, Santa Barbara**
   ☐ **3420 Twelfth Street, Riverside**

3. a. ☒ This Motion is being heard on REGULAR NOTICE pursuant to Local Bankruptcy Rule 9013-1. If you wish to oppose this Motion, you must file a written response to this Motion with the Bankruptcy Court and serve a copy of it upon the Movant's attorney (or upon Movant, if the Motion was filed by an unrepresented individual) at the address set forth above no less than 14 days before the above hearing and appear at the hearing of this Motion.

   b. ☐ This Motion is being heard on SHORTENED TIME. If you wish to oppose this Motion, you must appear at the hearing. Any written response or evidence must be filed and served:

   ☐ at the hearing     ☐ at least ___ court days before the hearing.

   (1) ☐ A Motion for Order Shortening Time was not required (according to the calendaring procedures of the assigned judge).

   (2) ☐ A Motion for Order Shortening Time was filed per Local Bankruptcy Rule 9075-1(b) and was granted by the Court.

   (3) ☐ A Motion for Order Shortening Time has been filed and remains pending. Once the Court has ruled on that Motion, you will be served with another notice or an order that will specify the date, time and place of the hearing on the attached Motion and the deadline for filing and serving a written opposition to the Motion.

4. You may contact the Bankruptcy Clerk's Office to obtain a copy of an approved court form for use in preparing your response *(Optional Court Form F 4001-1M.RES)*, or you may prepare your response using the format required by Local Bankruptcy Rule 9004-1 and the Court Manual

*(Continued on next page)*

*December 2009*

**F 4001-1M.PP**



American LegalNet, Inc.
www.FormsWorkFlow.com

Motion for Relief from Stay (Personal Property) - *Page 2 of 2*    **F 4001-1M.PP**

| In re CHOA Vision, LLC | (SHORT TITLE) | CHAPTER: 11 |
|---|---|---|
| | Debtor(s). | CASE NO.: 10-44798 RN |

5.  If you fail to file a written response to the Motion or fail to appear at the hearing, the Court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

Dated: February 8, 2011

ALSTON & BIRD LLP
*Print Law Firm Name (if applicable)*

Leib M. Lerner
*Print Name of Individual Movant or Attorney for Movant*

/s/ Leib M. Lerner
*Signature of Individual Movant or Attorney for Movant*

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

*December 2009*

**F 4001-1M.PP**

American LegalNet, Inc.
www.FormsWorkFlow.com

| In re<br>CHOA Vision, LLC | (SHORT TITLE) | CHAPTER: 11 |
|---|---|---|
| | Debtor(s). | CASE NO.: 10-44798 RN |

# MOTION FOR RELIEF FROM STAY
## (MOVANT: <u>HOLIDAY HOSPITALITY FRANCHISING, INC.</u>)

1. **The Property at Issue:** Movant moves for relief from the automatic stay with respect to the following personal property (the "Property"):

   ☐ Vehicle *(describe year, manufacturer, type, and model):*

       *Vehicle Identification Number:*
       *Location of vehicle (if known):*

   ☐ Equipment *(describe manufacturer, type, and characteristics):*

       *Serial number(s):*
       *Location (if known):*

   ☒ Other Personal Property *(describe type, identifying information, and location):*
   License Agreement dated February 28, 2007 (as same may have been amended) between Choa Vision, LLC and Holiday Hospitality Franchising, Inc. for the Crowne Plaza Hotel located at 50 Morgan Street, Harford, CT 06103

2. **Case History:**
   a. ☒ A voluntary ☐ An involuntary petition under Chapter ☐ 7 ☒ 11 ☐ 12 ☐ 13
   was filed on *(specify date):* August 18, 2010
   b. ☐ An Order of Conversion to Chapter ☐ 7 ☐ 11 ☐ 12 ☐ 13
   was entered on *(specify date):*
   c. ☐ Plan was confirmed on *(specify date):*
   d. ☐ Other bankruptcy cases affecting this Property have been pending within the past two years. See attached Declaration.

3. **Grounds for Relief from Stay:**
   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists to grant Movant the requested relief from stay as follows:
      (1) ☐ Movant's interest in the Property is not adequately protected.
         (a) ☐ Movant's interest in the collateral is not protected by an adequate equity cushion.
         (b) ☐ The fair market value of the Property is declining and payments are not being made to Movant sufficient to protect Movant's interest against that decline.
         (c) ☐ No proof of insurance re Movant's collateral has been provided to Movant, despite borrower(s)'s obligation to insure the collateral under the terms of Movant's contract with Debtor(s).
         (d) ☐ Payments have not been made as required by an Adequate Protection Order previously granted in this case.
      (2) ☐ The bankruptcy case was filed in bad faith to delay, hinder or defraud Movant.
         (a) ☐ Movant is the only creditor or one of very few creditors listed on the master mailing matrix.
         (b) ☐ The Property was transferred to Debtor(s) either just before the bankruptcy filing or since the filing.
         (c) ☐ Non-individual entity was created just prior to bankruptcy filing for the sole purpose of filing bankruptcy.
         (d) ☐ Other bankruptcy cases have been filed asserting an interest in the same Property.
         (e) ☐ The Debtor(s) filed what is commonly referred to as a "face sheet" filing of only a few pages consisting of the Petition and a few other documents. No Schedules or Statement of Affairs (or Chapter 13 Plan, if appropriate) has been filed.

*(Continued on next page)*

---

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

American LegalNet, Inc.
www.FormsWorkFlow.com

Motion for Relief from Stay (Personal Property) - *Page 4 of* 4 **F 4001-1M.PP**

| In re<br>CHOA Vision, LLC | (SHORT TITLE) | CHAPTER: 11 |
|---|---|---|
| | Debtor(s). | CASE NO.: 10-44798 RN |

(3) ☐ *(Chapter 12 or 13 cases only)*

    (a) ☐ Postconfirmation plan payments have not been made to the standing trustee.

    (b) ☐ Postconfirmation payments required by the confirmed plan have not been made to Movant.

(4) ☐ The lease has been rejected or deemed rejected by operation of law.

(5) ☒ For other cause for relief from stay, see attached continuation page.

b. ☐ Pursuant to 11 U.S.C. § 362(d)(2)(A), Debtor(s) has/have no equity in the Property; and pursuant to § 362(d)(2)(B), the Property is not necessary for an effective reorganization.

4. ☐ Movant also seeks annulment of the stay so that the filing of the bankruptcy petition does not affect postpetition acts, as specified in the attached Declaration(s).

5. **Evidence in Support of Motion:** *(Important Note: Declaration(s) in support of the Motion MUST be attached hereto.)*

    a. ☒ Movant submits the attached Declaration(s) on the Court's approved forms (if applicable) to provide evidence in support of this Motion pursuant to Local Bankruptcy Rules.

    b. ☒ Movant submits the attached supplemental Declaration(s) under penalty of perjury, to provide additional admissible evidence in support of this Motion.

    c. ☐ Movant requests that the Court consider as admissions the statements made by Debtor(s) under penalty of perjury concerning Movant's claims and the Property set forth in Debtor's(s') Schedules. Authenticated copies of the relevant portions of the Schedules are attached as Exhibit ___.

    d. ☒ Other evidence *(specify)*: Exhibit 1, Franchise Agreement; Exhibit 2, Notices of Termination; Exhibit 3, Monthly Summary for August 2010; Exhibit 4, 12 Month Overall Satisfaction Threshholds; Exhibit 5, Monthly Summary for October 2010, Exhibit 6, Monthly Summary for December 2010

6. ☒ **An optional Memorandum of Points and Authorities is attached to this Motion.**

**WHEREFORE, Movant prays that this Court issue an Order terminating or modifying the stay and granting the following *(specify forms of relief requested)*:**

1. ☐ Relief from the stay allowing Movant (and any successors or assigns) to proceed under applicable non-bankruptcy law to enforce its remedies to repossess and sell the Property.

2. ☐ Annulment of the stay so that the filing of the bankruptcy petition does not affect postpetition acts, as specified in the attached Declaration(s).

3. Additional provisions requested:

    a. ☒ That the Order be binding and effective despite any conversion of this bankruptcy case to a case under any other chapter of Title 11 of the United States Code.

    b. ☒ That the 14-day stay prescribed by Bankruptcy Rule 4001(a)(3) be waived.

    c. ☐ That Extraordinary Relief be granted as set forth in the Attachment *(attach Optional Court Form F 4001-1M.ER)*.

    d. ☒ For other relief requested, see attached continuation page.

*(Continued on next page)*

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

December 2009

**F 4001-1M.PP**
American LegalNet, Inc.
www.FormsWorkFlow.com

Motion for Relief from Stay (Personal Property) - *Page 5 of 5*   **F 4001-1M.PP**

| In re<br>CHOA Vision, LLC | (SHORT TITLE) | CHAPTER: 11 |
|---|---|---|
| | Debtor(s). | CASE NO.: 10-44798 RN |

4.  If relief from stay is not granted, Movant respectfully requests the Court to order adequate protection.


Dated: February 8, 2011

Respectfully submitted,

Holiday Hospitality Franchising, Inc.
*Movant Name*

ALSTON & BIRD LLP
*Firm Name of Attorney for Movant (if applicable)*

By: /s/ Leib M. Lerner
     *Signature*

Name:  Leib M. Lerner
       *Typed Name of Individual Movant or Attorney for Movant*


This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

**F 4001-1M.PP**

*December 2009*

American LegalNet, Inc.
www.FormsWorkFlow.com

Motion for Relief from Stay (Personal Property) - *Page 6 of 6*  **F 4001-1M.PP**

| In re<br>CHOA Vision, LLC | (SHORT TITLE) | CHAPTER: 11 |
|---|---|---|
| | Debtor(s). | CASE NO.: 10-44798 RN |

## PERSONAL PROPERTY DECLARATION
### (MOVANT: HOLIDAY HOSPITALITY FRANCHISING, INC.)

I, Chris Bagnato_____, declare as follows:
*(Print Name of Declarant)*

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age. I have knowledge regarding Movant's interest in the personal Property that is the subject of this Motion ("Property") because *(specify)*: I am the person for moving party franchisor responsible for supervising the debtor franchisee and its compliance with the franchise agreement.
   - ☐ I am the Movant and owner of the Property.
   - ☐ I manage the Property as the authorized agent for the Movant.
   - ☐ I am employed by the Movant as *(state title and capacity)*:
   - ☒ Other *(specify)*: Employed by Six Continents Hotels Inc., 100% owner of movant Holiday Hospitality Franchising, Inc., *as* Vice President Hotel Quality, Americas, InterContinental Hotels Group

2. I am one of the custodians of the books, records and files of Movant as to those books, records and files that pertain to loans, leases, or extensions of credit given to Debtor(s) concerning the Property. I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the Court if required.

3. The Property that is the subject of this Motion is:
   - ☐ Vehicle *(describe manufacturer, type, model, and year)*:
     
     Vehicle Identification Number:
     Location of vehicle (if known):
   - ☐ Equipment *(describe manufacturer, type, and characteristics)*:
     
     Serial number(s):
     Location (if known):
   - ☒ Other Personal Property *(describe type, identifying information, and location)*: License Agreement dated February 28, 2007 (as same may have been amended) between Choa Vision, LLC and Holiday Hospitality Franchising, Inc. for the Crowne Plaza Hotel located at 50 Morgan Street, Harford, CT 06103
4. Debtor(s) ☒ listed the Property on Schedule B ☐ did not list the Property on Schedule B.

5. The nature of Debtor's(s') interest in the Property is:
   a. ☐ Sole owner
   b. ☐ Co-owner
   c. ☐ Lessee
   d. ☒ Other *(specify)*: Franchisee

*(Continued on next page)*

December 2009

**F 4001-1M.PP**
American LegalNet, Inc.
www.FormsWorkFlow.com

Motion for Relief from Stay (Personal Property) - *Page 7 of 7*  **F 4001-1M.PP**

| In re<br>CHOA Vision, LLC | (SHORT TITLE) | | CHAPTER: 11 |
|---|---|---|---|
| | | Debtor(s). | CASE NO.: 10-44798 RN |

6. The lease was rejected on _____ *(specify date)*:

    a.  ☐  by operation of law.

    b.  ☐  by Order of the Court.

7. Movant has a perfected security interest in the Property.

    a.  The Property is a motor vehicle, boat, or other property for which a Title Certificate is provided for by state law. True and correct copies of the following items are attached to this Motion:

        (1)  ☐  Certificate of Title *("Pink Slip")* attached as Exhibit ___.

        (2)  ☐  Vehicle or other Lease Agreement attached as Exhibit ___.

        (3)  ☐  Security Agreement attached as Exhibit ___.

        (4)  ☐  Other evidence of perfection attached as Exhibit ___.

    b.  The Property is equipment, intangibles, or other personal property for which a Title Certificate is not provided for by state law. True and correct copies of the following items are attached:

        (1)  ☐  Security Agreement attached as Exhibit ___.

        (2)  ☐  UCC-1 Financing Statement attached as Exhibit ___, as recorded on *(specify date)*:

        (3)  ☐  UCC Financing Statement search results attached as Exhibit ___.

        (4)  ☐  Results of search of recorded or filed leases attached as Exhibit ___.

        (5)  ☐  Other evidence of perfection of a security interest attached as Exhibit ___.

    c.  The Property is consumer goods. True and correct copies of the following items are attached:

        (1)  ☐  Credit Application attached as Exhibit ___.

        (2)  ☐  Purchase Agreement attached as Exhibit ___.

        (3)  ☐  Account Statement showing payments made and balance due attached as Exhibit ___.

        (4)  ☐  Other evidence of perfection of a security interest *(if necessary under state law)* attached as Exhibit ___.

    d.  ☐  Other liens against the Property are set forth on the attached continuation page.

8. Status of Movant's debt:

    a.  A true and correct copy of the promissory note or other document that evidences the debt owed by Debtor(s) to Movant is attached as Exhibit ___.

    b.  Amount of current monthly payment: $

    c.  Number of payments that have come due and were not made:

    d.  Last payment received on *(specify date)*:

9. Attached hereto as Exhibit ___ is a true and correct copy of a POSTPETITION payment history that accurately reflects the dates and amounts of all payments made by the Debtor(s) since the petition date.

10. Amount of Movant's debt:

    a.  Principal:    $ _____

    b.  Accrued Interest:    $ _____

    c.  Costs (Attorney's Fees, Late Charges, Other Costs):    $ _____

    d.  Advances (Property Taxes, Insurance):    $ _____

    e.  TOTAL CLAIM as of ___:    $ _____

*(Continued on next page)*

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

American LegalNet, Inc.
www.FormsWorkFlow.com

Motion for Relief from Stay (Personal Property) - *Page 8 of* 8   **F 4001-1M.PP**

| In re                                    | (SHORT TITLE) |              | CHAPTER: 11              |
|------------------------------------------|---------------|--------------|--------------------------|
| CHOA Vision, LLC                         |               | Debtor(s).   | CASE NO.: 10-44798 RN    |

f.  Future payments due by time of anticipated hearing date *(if applicable)*:
An additional payment of $ _____ will come due on _____, and on the _____ day of
each month thereafter. If the payment is not received by the _____ day of the month, a late charge of
$ _____ would be due under the terms of the loan.

11. ☐  *(Chapter 7 and 11 cases only)* The fair market value of the Property is: $ _____. This valuation is based
upon the following supporting evidence:

a.  ☐  This is the value indicated for collateral of this year, make, model, and general features in the reference guide most commonly
used source for valuation data used by Movant in the ordinary course of its business for determining the value of this type of
collateral. True and correct copies of the relevant excerpts of the most recent edition are attached as Exhibit _____.

b.  ☐  This is the value determined by an appraisal or other expert evaluation. A true and correct copy of the expert's report or
declarations attached as Exhibit ___.

c.  ☐  Debtor's(s') admissions in the Schedules filed in the case. A true and correct copy of the relevant portions of the
Debtor's(s') Schedules are attached as Exhibit ___.

d.  ☐  Other basis for valuation *(specify)*:

---

**NOTE:**  *If valuation is contested, supplemental declarations providing additional foundation for the opinions of value should be
submitted.*

---

12. Calculation of equity in Property:

a.  By subtracting the total amount of all liens from the value of the Property as set forth in Paragraph 11 above, I calculate that the
Debtor's(s') equity in the Property is $ _____ (§ 362(d)(2)(A)).

b.  I calculate that the value of the "equity cushion" in the Property exceeding Movant's debt and any lien(s) senior to Movant is
$ _____ (§ 362(d)(1))

13. ☐  The fair market value of the Property is declining based on/due to: _____

14. ☐  *(Chapter 12 or 13 cases only)* Chapter 12 or 13 case status information:

a.  341(a) Meeting currently scheduled for (or concluded on) the following date:
Confirmation hearing currently scheduled for (or concluded on) the following date:
Plan confirmed at hearing on the following date *(if applicable)*:

b.  Postpetition/preconfirmation payments due BUT REMAINING UNPAID since the filing of the case:

| | | | | | |
|---|---|---|---|---|---|
| *(Number of)* _____ payment(s) due at $ _____ | each | = | $ _____ | 0.00 |
| *(Number of)* _____ payment(s) due at $ _____ | each | = | $ _____ | 0.00 |
| *(Number of)* _____ late charge(s) at   $ _____ | each | = | $ _____ | 0.00 |
| *(Number of)* _____ late charge(s) at   $ _____ | each | = | $ _____ | 0.00 |

c.  Postpetition/preconfirmation advances or other charges due but unpaid:        $ _____
(See attachment for details of type and amount.)

**TOTAL POSTPETITION/PRECONFIRMATION DELINQUENCY:**  $ _____ 0.00

*(Continued on next page)*

---

*December 2009*

**F 4001-1M.PP**


American LegalNet, Inc.
www.FormsWorkFlow.com

| In re (SHORT TITLE) CHOA Vision, LLC | CHAPTER: 11 |
|---|---|
| Debtor(s). | CASE NO.: 10-44798 RN |

d. Postconfirmation/payments due BUT REMAINING UNPAID since plan confirmation *(if applicable)*:

| *(Number of)* _____ payment(s) due at $ _____ each | = | $ _____ |
|---|---|---|
| *(Number of)* _____ payment(s) due at $ _____ each | = | $ _____ |
| *(Number of)* _____ late charge(s) at $ _____ each | = | $ _____ |
| *(Number of)* _____ late charge(s) at $ _____ each | = | $ _____ |

c. Postconfirmation advances or other charges due but unpaid:        $ _____
   (See attachment for details of type and amount.)

**TOTAL POSTCONFIRMATION DELINQUENCY:**        $ _____

f. ☐ The claim is provided for in the Chapter 12 or 13 Plan. Plan payment history is attached as Exhibit ___.

g. ☐ See attached Declaration(s) of Chapter 12 or 13 Trustee regarding receipt of payments under the plan *(attach Court Form F 4001-1M.13).*

15. ☐ Movant has not been provided with evidence that the Property is currently insured, as required under the terms of the loan.

16. ☐ Movant seeks annulment of the automatic stay so that the filing of the bankruptcy petition does not affect any and all of the enforcement actions that were taken after the filing of the bankruptcy petition in this case.

a. ☐ These actions were taken by Movant without knowledge of the bankruptcy filing, and Movant would have been entitled to relief from stay to proceed with these actions.

b. ☐ For other facts justifying annulment, see attached continuation page.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on** February 8, **2011 at Atlanta, GA** *(city, state)*.

Chris Bagnato
*Print Declarant's Name*

*Signature of Declarant*

December 2009

**F 4001-1M.PP**

American LegalNet, Inc.
www.FormsWorkFlow.com

## 3.a - Continuation Page

The Debtor is in continuous violation of the Franchise Agreement.  On January 11, 2010, the Debtor was sent a pre-petition notice of termination, based upon the Debtor's failure to maintain acceptable quality scores on the Hotel.  The deadline was extended multiple times, ultimately to November 14, 2010.  The Debtor's quality scores have not improved and, in fact, continue to sink, thereby damaging the Crowne Plaza name and HHFI's franchise.  Since the Petition Date, the quality scores have sunk dramatically, and there appears to be no hope for the Debtor to raise its scores to an acceptable level.

## <u>3.d - Continuation Page</u>

Relief from the Stay for  HHFI to take any and all steps to enforce the terms and conditions of the License Agreement, including (i) terminating the License Agreement, (ii) taking  the necessary action to require the Debtor to take all action necessary to de-identify the Hotel and to cease use of HHFI's intellectual property; (iii) authorizing HHFI to remove Debtor from the Reservation Service and System; and (iv) allow HHFI to take any other actions necessary to protect its Marks and the use of the System.

LEGAL02/32177448v2

Leib M. Lerner (CA Bar No. 227323)
Diane C. Stanfield (CA Bar No. 106366)
**ALSTON & BIRD LLP**
333 South Hope Street, Sixteenth Floor
Los Angeles, California 90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100
leib.lerner@alston.com
diane.stanfield@alston.com

Attorneys for Holiday Hospitality Franchising, Inc.

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:  CHOA VISION, LLC, | Chapter 11 |
| Debtor and Debtor in Possession. | Case No.:  2:10-bk-44798 RN |
| | **POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RELIEF FROM STAY OF HOLIDAY HOSPITALITY FRANCHISING, INC.; SUPPLEMENTAL DECLARATION OF CHRIS BAGNATO IN SUPPORT OF MOTION** |
| | Hearing on Motion<br>Date:   March 8, 2011<br>Time:   9:00 am<br>Place:  Courtroom 1645<br>            255 E Temple St.<br>            Los Angeles, CA 90012 |

**TO THE HONORABLE RICHARD M. NEITER AND OTHER PARTIES IN INTEREST:**

Holiday Hospitality Franchising, Inc. ("HHFI" or "Licensor") submits its Points and Authorities in Support of Motion for Relief from Stay (the "Motion"), as follows:

**BACKGROUND**

A.    **The Franchise Agreement**

Debtor Choa Vision, LLC ("Debtor") operates a Crowne Plaza hotel (the "Hotel") subject to a certain Crowne Plaza Change of Ownership License Agreement (as amended, the "Franchise

1

Agreement") dated February 28, 2007.  A true and correct copy of the Franchise Agreement is attached as **Exhibit 1** to the Motion.

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code ("Petition") on August 18, 2010 (the "Petition Date"), and continues to operate the Hotel.

**B.    Summary of Relief Requested**

On January 11, 2010, the Debtor was sent a pre-petition notice of termination, based upon the Debtor's failure to maintain acceptable quality scores on the Hotel.  The deadline was extended multiple times, ultimately to November 14, 2010.  The Debtor's quality scores have not improved and, in fact, continue to sink, thereby damaging the Crowne Plaza name and HHFI's franchise. Since the Petition Date, the quality scores have sunk dramatically, and there appears to be no hope for the Debtor to raise its scores to an acceptable level.

HHFI respectfully requests that the Court enter an order terminating the automatic stay: (i) to grant relief from stay for HHFI to terminate the Franchise Agreement; (ii) to allow HHFI to exercise its rights under the Franchise Agreement, including to require the Debtor to take all action necessary to de-identify the Hotel and to cease use of HHFI's intellectual property; (iii) ordering the Debtor to take all action necessary to de-identify the Hotel and to cease use of HHFI's intellectual property; (iv) authorizing HHFI to remove Debtor from the reservation service and System (defined below); (v) authorizing HHFI to take any other actions necessary to protect its Marks (defined below) and the use of the System; (vi) waiving the provision of FRBP 4001(a)(3); and (vii) for such other and further relief as the Court may order.

True and correct copies of the notices of termination sent to the Debtor are attached as **Exhibit 2** to the Motion.

**C.    The Marks**

HHFI, its predecessors, affiliates, subsidiaries and parents (collectively, "InterContinental Hotels Group" or "IHG") are in the business of operating, both self-owned and through license agreements, a worldwide network of hotels utilizing the service mark "Crowne Plaza®" and other associated trademarks and service marks.  In conducting this business, IHG owns and licenses a system of operations (the "System") designed to provide distinctive, high quality hotel services to

2

the public under the trade name and service marks "Crowne Plaza®," "Crowne Plaza® Suites" and "Crowne Plaza® Resort," and other marks (collectively, the "Marks").

The products and services of IHG through its authorized licenses and otherwise, have been extensively advertised and offered throughout the United States and the world.  HHFI has, in connection with all such activities, licensed the Marks throughout the United States to identify its products and services for the purpose of distinguishing them from the products and services of others.

HHFI and/or its affiliates own the Marks, and they have been duly registered in the United States Patent and Trademark Office.  The rights of HHFI in the Marks, and in each of them individually, have become incontestable, as that term is used in Section 15 of the Lanham Act, 15 U.S.C. § 1065.

Since the registration of the Marks in the United States Patent and Trademark Office, HHFI and/or its affiliates have used the registered notice symbol "®" or "Reg. U.S. Pat. & Tm. Off." or "Registered in the U.S. Patent and Trademark Office" in association with the Marks, as prescribed in Section 29 of the Lanham Act, 15 U.S.C. § 1111.

The Marks and the goodwill of the business associated with them are of great and inestimable value, are highly distinctive and have become universally associated in the public mind with products and services of the highest quality and reputation.

**D.    The Default**

One common evaluation method used to determine whether a specific property is keeping to IHG's standards is to measure that property against its peers.  IHG has a quality assurance program whereby it regularly inspects each licensed property and collects customer surveys in order to grade all properties on a scale of 0-100, with 100 being a perfect score.

Poor guest satisfaction and conditions reflect poorly on HHFI and the entire IHG hotel system.  For example, when a hotel guest has a bad experience at a HHFI hotel, that same guest will possibly associate such experience with all HHFI related hotels.  Such a situation adversely affects the business and reputation of HHFI in the market place to the detriment of HHFI and its franchises. A true and correct copy of the monthly summary for August 2010 reporting the results of the

3

customer surveys regarding the Debtor during the same month that it filed its Petition is attached as **Exhibit 3** to the Motion.  As can be seen from the summary, the Hotel received a failing grade for "Overall Satisfaction at this hotel," was extremely deficient in significant areas as compared to its peers, and its numbers were sinking:

    a.   The 12 month "Overall satisfaction at this hotel" score was 77.26, whereas the brand average is 84.52.  The Hotel's 3 month rolling average is down to 68.15.

    b.   The Hotel's 12 month "overall service" score is 69.35, its 3 month rolling average is down to 59.23, and the brand average is 76.9.

    c.   The Hotel's 12 month "fresh, up to date appearance" score is 59.27, its 3 month rolling average is down to 58.04, and the brand average is 70.27;

    d.   All of the Hotel's 12 month scores are below brand's rolling average.  Across the board, the Hotel's 3 month rolling average is below (and in some instances, significantly below) its 12 month average.

A 12 Month Overall Satisfaction Thresholds chart is attached as **Exhibit 4** to the Motion. That chart depicts the grades for "overall satisfaction" of a number of IHG brands, including "CP" or Crowne Plaza.  A Crowne Plaza hotel must receive an "overall satisfaction" score of at least 82.00 in order to avoid a failing grade.  It must receive an "overall satisfaction" score of at least 84.00 to be satisfactory and not require further action.  These requirements are communicated to all franchisees, and were communicated to the Debtor.

Section 3.A. of the License requires the Debtor to, in relevant part:

(2) maintain the Hotel in a clean, safe and orderly manner and in first class condition;

(3) provide efficient, courteous and high-quality service to the public;

. . .

(5) strictly comply in all respects with the Manual…and with all other policies, procedures and requirements of Licensor which may be from time to time communicated to Licensee…;

4

(6) strictly comply with all of Licensor's standards and specifications for goods and services used in the operation of the Hotel and other reasonable requirements to protect the system and the Hotel from unreliable sources of supply;

(7) strictly comply with Licensor's requirements as to: …(g) maintenance, appearance and condition of the Hotel; and (h) quality and types of services offered to customers at the Hotel.

. . .

(16) in all respects use Licensee's best efforts to reflect credit upon and create favorable public response to the name "Crowne Plaza";….

Franchise Agreement, **Exhibit 1** to the Motion.

Section 12.C of the Franchise Agreement provides for termination by HHFI for Debtor's breach, in pertinent part as follows:

(1) In accordance with notice from Licensor to Licensee, this License will terminate, without any further notice unless required by law), provided that:

(a) the notice is mailed at least 30 days (or longer, if required by law) in advance of the termination date; and
(b) the notice reasonably identifies one or more breaches of the Licensee's obligations; and
(c) the breach(es) are not fully remedied within the time period specified in the notice.

Franchise Agreement, section 12.C.

Upon termination of the Franchise Agreement, the Debtor agrees to cease using, among other things, the Crowne Plaza name, the Marks and signage. *See* Franchise Agreement, section 12.E. In addition, section 12.E. of the License Agreement provides that the Debtor will take whatever action is necessary to assure that no use is made of any part of the System or Marks at or in connection with the Hotel upon termination of the License Agreement. *Id*.

On January 11, 2010, the Debtor was given notice of default based upon its failure to maintain the required 12 month Overall Satisfaction Score, and a termination date of April 14, 2010 was established. On April 19, 2010, the Debtor termination date was extended to May 14, 2010. In

a letter dated May 26, 2010, the termination date was further extended to November 14, 2010.  No further extensions were granted.

A true and correct copy of the monthly summary for October 2010 reporting the results of the customer surveys regarding the Debtor is attached as **Exhibit 5** to the Motion.  As can be seen from the summary, the Hotel's numbers were worse than those from August 2010, and its failing grade continued to distance itself from an acceptable passing rate:

    a.  The 12 month "Overall satisfaction at this hotel" score was 74.93, a decrease since the failing grade of 77.26 in the August summary.  That number showed trending downward, since the monthly October score was just 71.43.

    b.  The 12 month "overall service" score was 67.24, down from 69.35 scored in August.

    c.  The Hotel's 12 month "fresh, up to date appearance" score was down to 57.48, a stark comparison to the brand average of 69.97.

A true and correct copy of the monthly summary for December 2010 reporting the results of the customer surveys regarding the Debtor is attached as **Exhibit 6** to the Motion.  As can be seen from the summary, the Hotel's numbers leaped downward from the already failing scores of October 2010, continuing to distance the Hotel from anywhere near an acceptable passing quality rate:

    a.  The 12 month "Overall satisfaction at this hotel" score was 73.86, a further decrease from the failing grades of 77.26 in the August summary and 74.93 in the October summary.

    b.  The monthly "Overall satisfaction at this hotel" score was a dismal 59.52.  That number was more than twelve points lower than the already failing monthly October score of 71.43.

    c.  The 12 month "overall service" score was down to 66.73 from 67.24 scored in October 2010.

    d.  The Hotel's 12 month "fresh, up to date appearance" score was a dismal 57.55, just slightly up from an already low 57.48 in the October 2010 scores, and disparately lower than the brand average of 69.68.

6

## DISCUSSION

**A.**    **There is Cause for Granting Relief from the Automatic Stay**

By this Motion, HHFI requests that the Court lift the automatic stay "for cause" pursuant to Section 362(d)(1) of the Bankruptcy Code.  It is apparent that the Hotel is not being kept in first-class condition, and management has not strictly complied with the maintenance and appearance requirements of the Franchise Agreement.

HHFI's primary mechanism for protecting the value and integrity of its name and the related Marks is through its quality assurance program.  Courts have recognized this principle when considering whether to grant a hotel licensor relief from the automatic stay.  For example, in *In re Tudor Motor Lodge Associates, L.P.*, 102 B.R. 936 (Bankr. D.N.J. 1989), the Court stated:

> The court agrees that [the licensor's] fundamental mechanism for protecting its reputation and name is the quality assurance system. Through franchise compliance [the licensor] ensures the avoidance of unsatisfactory guest experience. . . The court recognizes that [the licensor's] reputation and name are the basis of the bargain between [the licensor] and [the debtor].  Upon execution of the License Agreement, [the debtor] obtained the benefits of a recognized name in the hotel industry, goodwill, methods of doing business, and a built-in reservation system.  At the same time, however, the debtor obtained the burdens of compliance with the [licensor's] system.  This exchange is the "essence of the franchise relationship."

*Id*. at 955.  *See also Days Inns of America Franchising, Inc. v. Gainesville P-H Properties, Inc. (In re Gainesville P-H Properties, Inc.)*, 77 B.R. 285, 288 (Bankr. M.D. Fla. 1987) (Proctor, B.J.) (Court discussed the value of hotel licensor's name describing it as "an asset and good will of substantial value").

7

**B.      Relief Should be Granted to HHFI to Terminate the Franchise Agreement**

Failure to cure substantial postpetition defaults or breaches of executory contracts may constitute "cause" for relief from the automatic stay.  *See In re Deppe*, 110 B.R. 898 (Bankr. D. Minn. 1990) (franchisor was entitled to relief from stay to terminate all remaining aspects of franchise relationship when franchisee had material postpetition default).

The Hotel has failing quality scores, and is therefore in default of its Franchise Agreement. As reflected by guest surveys, the public is not happy about the service or conditions at the Hotel. The Hotel's continued default on its obligations in the Franchise Agreement constitutes a significant adverse reflection upon the Hotel, the System, the Marks and IHG.  Therefore, HHFI seeks relief from the automatic stay to terminate the Franchise Agreement pursuant to Paragraph 12.C., because more than 30 days have passed since the Notice was sent to the Debtor on January 11, 2010, and not all defaults have been cured.  HHFI has given the Debtor more than a year to raise its quality scores, and all that has happened is the condition of the Hotel – and commensurate reputation of HHFI's brand – suffers.

**C.      Once the Franchise Agreement is Terminated, the Debtor Must Cease Using the System and Marks, and Must De-Identify Itself as a Crowne Plaza Hotel**

Once the Franchise Agreement is terminated, the Debtor does not have the right or authority to (i) use the System or Marks under the Franchise Agreement or (ii) continue to identify itself as a Crowne Plaza hotel.

The failure of the Debtor to cease using the System and Marks after the expiration of the license is a violation of the Franchise Agreement. Pursuant to the Franchise Agreement, the Debtor may only use the System during the term of the license.  *See* Franchise Agreement § 2.  The Debtor may also only use the Reservation Service (as defined in the Franchise Agreement) during the term of the license.  *See* Franchise Agreement § 4.B.

In addition, the Lanham Act, 15 U.S.C. § 1114(1) and 1125(a), precludes infringement of federally registered trademark and service marks; likewise, California Bus. & Prof. Code §§17200

8

and §17200 precludes unfair competition and false advertising. *See also Burger King v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992) (it is "well-settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement"); *Davis v. McDonald's Corp.*, 44 F. Supp. 2d 1251, 1262 (N.D. Fla. 1998) (former franchisee's continued use of McDonald's trademarks would lead to confusion regarding their association and thus constituted trademark infringement under 15 U.S.C. § 1114); *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir. 1975) ("As a general rule… the same facts which would support an action for trademark infringement [under Section 32(1)] would also support an action for unfair competition [under Section 43(a)].").

**D.    Waiver of the 14 Day Stay is Appropriate to Protect the Marks**

Based upon the above, HHFI also requests that the Court waive the 14-day stay of the order granting relief from the automatic stay under Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure.  The Debtor's continued use of the System and Marks causes damage to HHFI that cannot be subsequently undone.  To mitigate this damage, HHFI seeks an order requiring Debtor to immediately take all necessary action to de-identify the Hotel and cease use of the System and Marks, and grant HHFI relief from the stay to take the necessary steps to protect its interest in the System and Marks, including immediately removing Debtor from the Reservation Service and the System.  Thus, HHFI respectfully submits that the 14-day stay imposed by Rule 4001(a)(3) should be waived.

## CONCLUSION

For the reasons stated above, HHFI respectfully requests that the Court enter an order terminating the automatic stay: (i) granting relief from stay for HHFI to terminate the Franchise Agreement; (ii) allowing HHFI to exercise its rights under the Franchise Agreement, including to require the Debtor to take all action necessary to de-identify the Hotel and to cease use of HHFI's intellectual property; (iii) ordering the Debtor to take all action necessary to de-identify the Hotel

9

1    and to cease use of HHFI's intellectual property; (iv) authorizing HHFI to remove Debtor from the

2    reservation service and System; (v) authorizing HHFI to take any other actions necessary to protect

3    its Marks and the use of the System; (vi) waiving the provision of FRBP 4001(a)(3); and (vii) for

4    such other and further relief as the Court may order.

5

6    DATED:  February 8, 2011                    **ALSTON & BIRD LLP**

7
                                                /s/Leib M. Lerner
8                                               _____
                                                     Leib M. Lerner
9                                               Attorneys for Holiday Hospitality Franchising, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### SUPPLEMENTAL DECLARATION OF CHRIS BAGNATO IN SUPPORT OF MOTION

I, Chris Bagnato, declare as follows:

1.      I am Employed by Six Continents Hotels Inc., 100% owner of movant Holiday Hospitality Franchising, Inc., as Vice President Hotel Quality, Americas, InterContinental Hotels Group.   I make this declaration in support of the Motion for Relief from the Automatic Stay of Holiday Hospitality Franchising, Inc. (the "Motion").    Capitalized terms not defined in this declaration shall have the meaning ascribed to them in the Motion.

2.      I have personal knowledge of the facts set forth in this declaration, except as to those facts stated on information and belief, which I believe to be true.  If called as a witness, I could and would testify competently to the facts set forth in this declaration.

3.      Debtor Choa Vision, LLC ("Debtor") operates a Crowne Plaza hotel (the "Hotel") subject to a certain Crowne Plaza Change of Ownership License Agreement (as amended, the "Franchise Agreement") dated February 28, 2007.   A true and correct copy of the Franchise Agreement is attached as **Exhibit 1** to the Motion.

4.      The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code ("Petition") on August 18, 2010 (the "Petition Date"), and continues to operate the Hotel.

5.      On January 11, 2010, the Debtor was sent a pre-petition notice of termination, based upon the Debtor's failure to maintain acceptable quality scores on the Hotel.  The deadline was extended multiple times, ultimately to November 14, 2010.  The Debtor's quality scores have not improved and, in fact, continue to sink, thereby damaging the Crowne Plaza name and HHFI's franchise.  Since the Petition Date, the quality scores have sunk dramatically, and there appears to be no hope for the Debtor to raise its scores to an acceptable level.

6.      True and correct copies of the notices of termination sent to the Debtor are attached as **Exhibit 2** to the Motion.

7.      HHFI, its predecessors, affiliates, subsidiaries and parents (collectively, "InterContinental Hotels Group" or "IHG") are in the business of operating, both self-owned and through license agreements, a worldwide network of hotels utilizing the service mark "Crowne Plaza®" and other associated trademarks and service marks.  In conducting this business, IHG owns

11

and licenses a system of operations (the "System") designed to provide distinctive, high quality hotel services to the public under the trade name and service marks "Crowne Plaza®," "Crowne Plaza® Suites" and " "Crowne Plaza® Resort," and other marks (collectively, the "Marks").

8.    The products and services of IHG through its authorized licenses and otherwise, have been extensively advertised and offered throughout the United States and the world.  I am informed and believe that HHFI has, in connection with all such activities, licensed the Marks throughout the United States to identify its products and services for the purpose of distinguishing them from the products and services of others.

9.    I am informed and believe that HHFI and/or its affiliates own the Marks, and they have been duly registered in the United States Patent and Trademark Office.  The rights of HHFI in the Marks, and in each of them individually, have become incontestable, as that term is used in Section 15 of the Lanham Act, 15 U.S.C. § 1065.

10.    I am informed and believe that since the registration of the Marks in the United States Patent and Trademark Office, HHFI and/or its affiliates have used the registered notice symbol "®" or "Reg. U.S. Pat. & Tm. Off." or "Registered in the U.S. Patent and Trademark Office" in association with the Marks, as prescribed in Section 29 of the Lanham Act, 15 U.S.C. § 1111.

11.    The Marks and the goodwill of the business associated with them are of great and inestimable value, are highly distinctive and have become universally associated in the public mind with products and services of the highest quality and reputation.

12.    One common evaluation method used to determine whether a specific property is keeping to IHG's standards is to measure that property against its peers.  IHG has a quality assurance program whereby it regularly inspects each licensed property and collects customer surveys in order to grade all properties on a scale of 0-100, with 100 being a perfect score.

13.    Poor guest satisfaction and conditions reflect poorly on HHFI and the entire IHG hotel system.  For example, when a hotel guest has a bad experience at a HHFI hotel, that same guest will possibly associate such experience with all HHFI related hotels.  Such a situation adversely affects the business and reputation of HHFI in the market place to the detriment of HHFI and its franchises.  A true and correct copy of the monthly summary for August 2010 reporting the results of

the customer surveys regarding the Debtor is attached as **Exhibit 3** to the Motion.  As can be seen from the summary, the Hotel received a failing grade for "Overall Satisfaction at this hotel," was extremely deficient in significant areas as compared to its peers, and its numbers are sinking:

> e. The 12 month "Overall satisfaction at this hotel" score was 77.26, whereas the brand average is 84.52.  The Hotel's 3 month rolling average is down to 68.15.

> f. The Hotel's 12 month "overall service" score is 69.35, its 3 month rolling average is down to 59.23, and the brand average is 76.9.

> g. The Hotel's 12 month "fresh, up to date appearance" score is 59.27, its 3 month rolling average is down to 58.04, and the brand average is 70.27;

> h. All of the Hotel's 12 month scores are below brand's rolling average.  Across the board, the Hotel's 3 month rolling average is below (and in some instances, significantly below) its 12 month average.

14.    A 12 Month Overall Satisfaction Thresholds chart is attached as **Exhibit 4** to the Motion.  That chart depicts the grades for "overall satisfaction" of a number of IHG brands, including "CP" or Crowne Plaza.  A Crowne Plaza hotel must receive an "overall satisfaction" score of at least 82.00 in order to avoid a failing grade.  It must receive an "overall satisfaction" score of at least 84.00 to be satisfactory and not require further action.  These requirements are communicated to all franchisees, and were communicated to the Debtor.

15.    Section 3.A. of the License requires the Debtor to, in relevant part:

> (2) maintain the Hotel in a clean, safe and orderly manner and in first class condition;

> (3) provide efficient, courteous and high-quality service to the public;

> . . .

> (5) strictly comply in all respects with the Manual…and with all other policies, procedures and requirements of Licensor which may be from time to time communicated to Licensee…;

> (6) strictly comply with all of Licensor's standards and specifications for goods and services used in the operation of the Hotel and other

13

1                 reasonable requirements to protect the system and the Hotel from

2                 unreliable sources of supply;

3                 (7) strictly comply with Licensor's requirements as to: …(g)

4                 maintenance, appearance and condition of the Hotel; and (h) quality

5                 and types of services offered to customers at the Hotel.

6                 . . .

7                 (16) in all respects use Licensee's best efforts to reflect credit upon

8                 and create favorable public response to the name "Crowne Plaza";….

9   Franchise Agreement, **<u>Exhibit 1</u>** to the Motion.

10        16.    Section 12.C of the Franchise Agreement provides for termination by HHFI for

11   Debtor's breach, in pertinent part as follows:

12        (1) In accordance with notice from Licensor to Licensee, this License will terminate, without

13           any further notice unless required by law), provided that:

14                 (a) the notice is mailed at least 30 days (or longer, if required by law)
                   in advance of the termination date; and

15                 (b) the notice reasonably identifies one or more breaches of the
16                   Licensee's obligations; and
                 (c) the breach(es) are not fully remedied within the time period
17                   specified in the notice.

18   Franchise Agreement, section 12.C.

19        17.    Upon termination of the Franchise Agreement, the Debtor agrees to cease using,

20   among other things, the Crowne Plaza name, the Marks and signage.  *See* Franchise Agreement,

21   section 12.E.  In addition, section 12.E. of the License Agreement provides that the Debtor will take

22   whatever action is necessary to assure that no use is made of any part of the System or Marks at or in

23   connection with the Hotel upon termination of the License Agreement.  *Id.*

24        18.    On January 11, 2010, the Debtor was given notice of default based upon its failure to

25   maintain the required 12 month Overall Satisfaction Score, and a termination date of April 14, 2010

26   was established.  On April 19, 2010, the Debtor termination date was extended to May 14, 2010.  In

27   a letter dated May 26, 2010, the termination date was further extended to November 14, 2010.  No

28   further extensions were granted.

19.    A true and correct copy of the monthly summary for October 2010 reporting the results of the customer surveys regarding the Debtor is attached as **Exhibit 5** to the Motion.  As can be seen from the summary, the Hotel's numbers were worse than those in August 2010, and its failing grade continued to distance itself from an acceptable passing rate:

     a.    The 12 month "Overall satisfaction at this hotel" score was 74.93, a significant decrease since the failing grade of 77.26 in the August summary.  That number was trending downward, since the monthly October score was just 71.43.

     b.    The 12 month "overall service" score was 67.24, down from 69.35 scored in August.

     c.    The Hotel's 12 month "fresh, up to date appearance" score was down to 57.48, a stark comparison to the brand average of 69.97.

A true and correct copy of the monthly summary for December 2010 reporting the results of the customer surveys regarding the Debtor is attached as **Exhibit 6** to the Motion.  As can be seen from the summary, the Hotel's numbers leaped downward from the already failing scores of October 2010, continuing to distance the Hotel from anywhere near an acceptable passing quality rate:

     a.    The 12 month "Overall satisfaction at this hotel" score was 73.86, a further decrease from the failing grades of 77.26 in the August summary and 74.93 in the October summary.

     b.    The monthly "Overall satisfaction at this hotel" score was a dismal 59.52.  That number was more than twelve points lower than the already failing monthly October score of 71.43.

     c.    The 12 month "overall service" score was down to 66.73 from 67.24 scored in October 2010.

     d.    The Hotel's 12 month "fresh, up to date appearance" score was a dismal 57.55, just slightly up from an already low 57.48 in the October 2010 scores, and disparately lower than the brand average of 69.68.

15

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct and that this declaration was executed on February 8, 2011, at Atlanta,

3    Georgia.

4

5    _____

6                                    Chris Bagnato

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

Exhibit 1-Page 28 of 108

LOCATION:  50 Morgan Street
Hartford, CT 06103

LOCATION #:  6323

DATE:  *February 28, 2007*

# HOLIDAY HOSPITALITY FRANCHISING, INC.

## CROWNE PLAZA
## CHANGE OF OWNERSHIP
## LICENSE AGREEMENT

### WITH

## CHOA VISION, LLC

### LICENSEE

Exhibit 1-Page 29 of 108

# HOLIDAY HOSPITALITY FRANCHISING, INC.

## CROWNE PLAZA LICENSE AGREEMENT TABLE OF CONTENTS

1. **THE LICENSE:** ...................................................................................................... 1
   - A.   THE HOTEL: ............................................................................................... 1
   - B.   THE SYSTEM: .............................................................................................. 1
2. **GRANT OF LICENSE:** ........................................................................................... 2
3. **LICENSEE'S RESPONSIBILITIES:** ...................................................................... 3
   - A.   OPERATIONAL AND OTHER REQUIREMENTS: ......................................... 3
   - B.   UPGRADING OF THE HOTEL: ................................................................... 3
   - C.   FEES: ......................................................................................................... 4
4. **LICENSOR'S RESPONSIBILITIES:** ...................................................................... 5
   - A.   TRAINING: .................................................................................................. 7
   - B.   RESERVATION SERVICES: ........................................................................ 7
   - C.   CONSULTATION ON OPERATIONS, FACILITIES AND MARKETING: ......... 7
   - D.   MAINTENANCE OF STANDARDS: ............................................................. 7
   - E.   APPLICATION OF MANUAL: ...................................................................... 8
   - F.   OTHER ARRANGEMENTS FOR MARKETING, ETC.: .................................. 8
   - G.   LICENSOR'S USE OF OTHER ADVERTISING/PROMOTIONAL SUPPORT FUNDS: 8
   - H.   USE OF SERVICES CONTRIBUTION: ......................................................... 8
   - I.   PERFORMANCE OF LICENSOR'S OBLIGATIONS: ..................................... 8
5. **APPEALS, CHANGES IN THE MANUAL:** ............................................................. 9
   - A.   APPEALS: ................................................................................................... 9
   - B.   CHANGES IN THE MANUAL: ...................................................................... 9
   - C.   DECISIONS ON APPEAL: ........................................................................... 9
   - D.   LIMITATION ON APPEAL RIGHTS: ............................................................. 9
6. **IAHI:** .................................................................................................................. 10
   - A.   MEMBERSHIP: ........................................................................................... 10
   - B.   FUNCTION OF COMMITTEES: ................................................................. 10
7. **PROPRIETARY RIGHTS:** .................................................................................. 10
   - A.   OWNERSHIP OF SYSTEM: ...................................................................... 10
   - B.   TRADEMARK DISPUTES: ......................................................................... 10
   - C.   PROTECTION OF NAME AND THE MARKS: ............................................. 11
   - D.   MODIFICATION OR DISCONTINUATION OF THE MARKS: ........................ 11
8. **RECORDS AND AUDITS:** .................................................................................. 11
   - A.   MONTHLY STATEMENTS: ........................................................................ 11
   - B.   PREPARATION AND MAINTENANCE OF RECORDS: ................................ 11
   - C.   AUDIT: ...................................................................................................... 12
   - D.   ANNUAL FINANCIAL STATEMENTS: ........................................................ 12
9. **INDEMNITY AND INSURANCE:** ......................................................................... 13

i

Exhibit 1-Page 30 of 108

    A.    Indemnity: ..........................................................................................................................

    B.    Insurance: ....................................................................................................................... 13

    C.    Evidence of Insurance: ...................................................................................................... 13

**10. Transfer:** ........................................................................................................................... 14

    A.    Transfer by Licensor: ....................................................................................................... **14**

    B.    Transfer by Licensee: ....................................................................................................... 14

    C.    Transfer of Equity Interests That Are Not Publicly Traded: ............................................ 14

    D.    Transfers of Publicly-Traded Equity Interests: ................................................................ 15

    E.    Transfer of the License: .................................................................................................... 16

    F.    Transfers of Equity Interest in the License Upon Death or To Family Members: ............ 16

    G.    Registration of a Proposed Transfer of Equity Interests: ................................................ 17

    H.    Change of Ownership: ...................................................................................................... 17

    I.    Transfer of Real Estate: .................................................................................................... 18

    J.    Management of the Hotel: ................................................................................................ 19

**11. Condemnation and Casualty:** ........................................................................................... 19

    A.    Condemnation: .................................................................................................................. **19**

    B.    Casualty: ........................................................................................................................... 19

    C.    No Extensions of Term: .................................................................................................... 19

**12. Termination:** ..................................................................................................................... 20

    A.    Expiration of Term: .......................................................................................................... **20**

    B.    Termination by Licensee on Advance Notice: .................................................................. 20

    C.    Termination by Licensor on Advance Notice: .................................................................. 20

    D.    Immediate Termination by Licensor: ............................................................................... 21

    E.    De-Identification of Hotel Upon Termination: ................................................................. 21

    F.    Payment of Liquidated Damages: .................................................................................... 23

**13. Relationship of Parties:** .................................................................................................. 23

    A.    No Agency Relationship: .................................................................................................. **23**

    B.    Licensee's Notices to Public Concerning Independent Status: ......................................... 23

**14. Miscellaneous:** .................................................................................................................. 23

    A.    Severability and Interpretation: ........................................................................................ **24**

    B.    Binding Effect: ................................................................................................................. 24

    C.    Exclusive Benefit: ............................................................................................................ 24

    D.    Entire Agreement: ............................................................................................................ 25

    E.    Licensor Withholding Consent: ....................................................................................... 25

    F.    Notices: ............................................................................................................................. 25

    G.    Authority: ......................................................................................................................... 25

    H.    General Release and Covenant Not to Sue: ...................................................................... 25

    I.    Performance of the Work: ................................................................................................. 26

    J.    Reimbursement of Expenses: ........................................................................................... 26

    K.    Descriptive Headings: ...................................................................................................... 27

    L.    Capital Reserve: ............................................................................................................... 27

    M.    Terrorism: ........................................................................................................................ 27

    N.    Business Judgment: .......................................................................................................... 27

    O.    Right of First Refusal ...................................................................................................... 27

**15.    Special Stipulations:** ................................................................................................... 28

**Guaranty** ................................................................................................................................... **28**

 ........................................................................................................................................... **30**

ii

Exhibit 1-Page 31 of 108

ATTACHMENT "A".................................................................................................
ATTACHMENT "B".................................................................................................32
..................................................................................................................................33

iii

Exhibit 1-Page 32 of 108

**Holiday Hospitality Franchising, Inc.**
**Three Ravinia Drive, Atlanta, Georgia 30346**
Crowne Plaza License Agreement

This License dated _February 28_____, 2007 (the "Term Commencement Date"), between Holiday Hospitality Franchising, Inc., a Delaware corporation ("Licensor"), and Choa Vision, LLC, a California limited liability company ("Licensee") whose address is 9629 Misty Meadow Lane, Escondido, CA 92026.

### The Parties Agree As Follows:

1.    **THE LICENSE:**

Licensor operates and licenses a system designed to provide a distinctive, high quality hotel service to the public under the name "Crowne Plaza®" (the "System" as defined in paragraph 1.B below). High standards established by Licensor are the essence of the System. Future investments may be required of Licensee under this License Agreement ("License"). Licensee has independently investigated the risks of the business to be operated hereunder, including current and potential market conditions, competitive factors and risks; has read Licensor's Uniform Franchise Offering Circular for prospective Crowne Plaza brand group franchisees ("UFOC"); and has made an independent evaluation of all such facts. Neither Licensor nor any other person on Licensor's behalf has made any representation to Licensee concerning this License not fully set forth herein. Aware of the relevant facts, Licensee desires to enter into this License in order to obtain a license to use the System in the operation of a Crowne Plaza branded hotel located at 50 Morgan Street, Hartford, CT 06103 (the "Hotel").

A.    **The Hotel:**

The Hotel comprises all structures, facilities, appurtenances, furniture, fixtures, equipment, and entry, exit, parking and other areas from time to time located on the land identified by Licensee to Licensor in anticipation of this License, or located on any land from time to time approved by Licensor for additions, signs or other facilities. The Hotel now includes the facilities listed on Attachment "A" hereto. No change in the number of approved guest rooms or suites and no other significant change in the Hotel or in the manner in which the Hotel rooms and services are offered to the public (including timesharing and condominium hotel projects not involving short term stays by transient guests) may be made without Licensor's approval. Licensee represents that it is entitled to possession of the Hotel during the entire license term without restrictions that would interfere with anything contemplated in this License. Throughout this License, the words "room" and "guest room" are intended to include the word "suites" unless otherwise indicated.

1

CP06

Exhibit 1-Page 33 of 108

**B.**    The System:

The System is composed of all elements which are designed to identify Crowne Plaza hotels to the consuming public or are designed to be associated with those hotels or to contribute to such identification or association and all elements which identify or reflect the quality standards and business practices of such hotels, all as specified in this License or as designated from time to time by Licensor. The System at present includes, but is not limited to, the principal trade and/or service marks Crowne Plaza,® Crowne Plaza® Suites and Crowne Plaza® Resort (as appropriate to the specific hotel operation to which it pertains), Holidex® and the other Marks, as defined in paragraph 7.B below, and  intellectual property rights made available to licensees of the System by reason of a license; all rights to domain names and other identifications or elements used in electronic commerce as may be designated from time to time by Licensor in accordance with Licensor's specifications to be part of the System; access to a reservation service operated in accordance with specifications established by Licensor from time to time; distribution of advertising, publicity and other marketing programs and materials; the furnishing of training programs and materials; confidential or proprietary information standards, specifications and policies for construction, furnishing, operation, appearance and service of the Hotel, and other requirements as stated or referred to in this License and from time to time in Licensor's Standards Manual (the "Manual") or in other communications to Licensee; and programs for inspecting the Hotel, measuring and assessing service, quality and consumer opinion and consulting with Licensee. Licensor may add elements to the System or modify, alter or delete elements of the System in its sole discretion from time to time.

**2.**    **GRANT OF LICENSE:**

Licensor hereby grants to Licensee a non-exclusive license to use the System only at the Hotel, but only in accordance with this License and only during the "License Term" beginning with the Term Commencement Date and terminating as provided under paragraph 12 hereof. The License applies to the location specified herein and to no other location. Licensee acknowledges that Licensor, its divisions, subsidiaries, affiliates and parents are and may in the future be engaged in other business activities including lodging and related activities, and that Licensee is acquiring no rights hereunder other than the right to use the System as specifically defined herein in accordance with the terms of this License.

This License does not limit Licensor's right or the rights of any parent, subsidiary or affiliate of Licensor, to use or license the System or any part thereof or to engage in or license any business activity at any other location, including, without limitation, the licensing, franchising, ownership, operation and/or management of lodging facilities and related activities under the names and marks associated with the System and/or any other names and marks. Licensee acknowledges that Licensor's rights to use and/or license the System, referenced immediately above, pre-date this License and are not limited or changed by the terms of this License. Licensee agrees that by acknowledging those rights, the parties do not intend to make Licensor's exercise of such rights subject to rules applicable to contractual performance or the exercise of contractual discretion under this License.

2

CP06

Exhibit 1-Page 34 of 108

3.   **LICENSEE'S RESPONSIBILITIES:**

A.   **Operational and Other Requirements:**

During the License Term, Licensee will:

(1)   maintain a high moral and ethical standard and atmosphere at the Hotel;

(2)   maintain the Hotel in a clean, safe and orderly manner and in first class condition;

(3)   provide efficient, courteous and high-quality service to the public;

(4)   operate the Hotel 24 hours a day every day except as otherwise permitted by Licensor based on special circumstances;

(5)   strictly comply in all respects with the Manual (as it may from time to time be modified or revised by Licensor) and with all other policies and requirements of Licensor which may be from time to time communicated to Licensee (which communication may be, at Licensor's option, in hard paper copy or digital, electronic or computerized form and Licensee must pay any costs to retrieve, review, use or access such digital, electronic or computerized communication);

(6)   strictly comply with all of Licensor's standards and specifications for goods and services used in the operation of the Hotel and other reasonable requirements to protect the System and the Hotel from unreliable sources of supply;

(7)   strictly comply with Licensor's requirements as to:

(a)   the types of services and products that may be used, promoted or offered at the Hotel;

(b)   the types and quality of services and products that, to supplement services listed on Attachment A, must be used, promoted or offered at the Hotel;

(c)   the use, display, style and type of signage and of all other forms of identification at or pertaining to the Hotel, including but not limited to any use of the Crowne Plaza name or any other of Licensor's service marks, trademarks or copyrights (in all formats, including but not limited to print, electronic or other media), which are seen by members of the consuming public or used to identify the Hotel to actual or prospective consumers;

(d)   directory and reservation service listings of the Hotel;

(e)   training of persons to be involved in the operation of the Hotel;

(f)   participation in all marketing, reservation service, advertising, training and operating programs designated by Licensor as System-wide (or area-wide) programs in the best interests of hotels using the System; provided that with regard to area-wide programs, Licensee may request Licensor's approval that Licensee need not participate, reasonable approval not to be withheld;

(g)   maintenance, appearance and condition of the Hotel; and

3

CP06

Exhibit 1-Page 35 of 108

(h)    quality and types of services offered to customers at the Hotel.

(8)    use such automated guest service and/or hotel management and/or telephone or telecommunication system(s) which Licensor deems to be in the best interests of the System, including any additions, enhancements, supplements, or variants thereof which may be developed during the term hereof;

(9)    participate in and use those reservation services which Licensor deems to be in the best interests of the System, including any additions, enhancements, supplements or variants thereof which may be developed during the term hereof;

(10)    adopt all improvements or changes to the System as may be from time to time designated by Licensor;

(11)    strictly comply with all governmental requirements, pay all taxes, and maintain all governmental licenses and permits necessary to operate the Hotel in accordance with the System;

(12)    permit inspection of the Hotel by Licensor's representatives at any time and give them free lodging for such time as may be reasonably necessary to complete their inspections;

(13)    promote the Hotel on a local or regional basis subject to Licensor's requirements as to form, content and prior approvals;

(14)    insure that no part of the Hotel or the System is used to further or promote a competing business or other lodging facility, except as Licensor may approve for businesses or lodging facilities owned, licensed, operated or otherwise approved by Licensor or its parents, divisions, subsidiaries, and affiliates;

(15)    use every reasonable means to encourage use of Crowne Plaza branded facilities everywhere by the public;

(16)    in all respects use Licensee's best efforts to reflect credit upon and create favorable public response to the name "Crowne Plaza";

(17)    promptly pay to Licensor all amounts due Licensor, its parents, subsidiaries and affiliates as royalties or fees, whether or not arising out of this License, or for goods or services purchased by Licensee for use at the Hotel; and

(18)    comply with Licensor's reasonable requirements concerning confidentiality of information, and in particular Licensee shall not disclose without Licensor's written permission, information pertaining to Licensor's marketing and reservations programs that have not been disclosed to the public.

**B.    <u>Upgrading of the Hotel</u>:**

Using the same requirements applicable generally to hotels under the System operated by Licensor and its licensees in the same category as the Hotel, Licensor may at any time during the term hereof require substantial modernization, renovation and other upgrading of the Hotel. Limited exceptions from those requirements may be made by Licensor based on local conditions or special circumstances. If the upgrading requirements contained in this paragraph

4

CP06

Exhibit 1-Page 36 of 108

3.B cause Licensee undue hardship, Licensee may terminate the License by complying with paragraph 12.B. The provisions of this paragraph and of paragraph 12.B are not applicable to the Work as defined in this License or to future upgrading requirements due to conversions, relicensing, product quality inspections of the Hotel, Standards Manual requirements or a request for change of ownership by Licensee.

    **C.**    <u>Fees:</u>

        (1)    For each month (or part of a month) during the License Term, Licensee will pay to Licensor by the 15th of the following month, except in the case of the Technology Fee in paragraph 3.C(1)(c) and the Crowne Plaza Hotel Marketing Association fee in paragraph 3.C(1)(f) below, which are payable monthly in advance:

            (a)    a royalty of **5%** of the Gross Rooms Revenue attributable to or payable for rental of guest rooms at the Hotel with no deduction for any item including but not limited to no adjustment for the cost of any food and beverage items provided or made available to a guest as an incident of a guest room rental, however with deductions for sales and room taxes only ("Gross Rooms Revenue"); and

            (b)    a "Services Contribution" equal to **3%** of Gross Rooms Revenue, to be used by Licensor for marketing, reservations, and other related activities which, in Licensor's sole business judgment as to the long-term interests of the System, support marketing, reservations and other related functions. Costs which a Licensee incurs in the acquisition, installation or maintenance of reservations services, equipment or training, or in its own marketing activities, do not constitute payment of the "Services Contribution". The Services Contribution is subject to change by Licensor from time to time if either approved by: (i) a majority of members (which shall be counted on the basis of one hotel, one vote) of the System who represent a majority of the hotels to be subject to the increase; or (ii) approved by a majority of the members of the System or the "IAHI" (the franchisee association or successor sanctioned as such by Licensor) at a meeting of System licensees or at an annual IAHI meeting either as may be convened by Licensor upon no less than 45 days' advance notice. Licensor may, in its sole discretion, upon 30 days' prior written notice, increase this Contribution by an amount not to exceed 1% of Gross Rooms Revenue and such increase shall be effective for a period no longer than 12 months; provided that, in the event of such increase, Licensor shall not make such a discretionary increase again for a period of 24 months after the expiration of any such increase; and

            (c)    a monthly Technology Fee of $11.34 for each guest room at the Hotel to be used by Licensor for provision of technology services such as, but not limited to, satellite communications services to the

5

Hotel, plus such increases as Licensor may judge reasonable, but in no case exceeding in any calendar year 10% of the fee in effect at the beginning of that year. (The Technology Fee does not include the cost of installation of any equipment at the Hotel); and

(d)     all fees due for travel agent commission programs, including Electronic Commission Services and Field Marketing Co-op programs attributable to the Hotel; and

(e)     an amount equal to any sales, gross receipts or similar tax imposed on Licensor and calculated solely on payments required hereunder, unless the tax is an optional alternative to an income tax otherwise payable by Licensor; and

(f)     a fee in an amount equal to $3.00 per room, per month for mandatory participation in the Crowne Plaza Hotel Marketing Association. This amount is subject to change from time to time by the Hotel Marketing Association. Said fees shall be invoiced in advance, but paid in arrears along with all invoiced fees.

Licensor may, at its election, require Licensee to pay all outstanding fees by electronic funds transfer/direct debit of account or other similar technology designed to accomplish the same purposes.

Licensee will operate the Hotel so as to maximize gross rooms revenue of the Hotel consistent with sound marketing and industry practice and will not engage in any conduct which reduces gross rooms revenue of the Hotel in order to further other business activities.

(2)     A standard application fee for additional rooms as set forth in Licensor's then current Crowne Plaza UFOC will be charged upon application for any additional guest rooms to be added to the Hotel.

(3)     Additional royalties may be charged on revenues (or upon any other basis, if so determined by Licensor) from any activity if it is added at the Hotel by mutual agreement and:

(a)     it is not now offered at System hotels generally and is likely to benefit significantly from or be identified significantly with the Crowne Plaza name or other aspects of the System; or

(b)     it is designed or developed by or for Licensor.

(4)     Charges may be made for optional products or services accepted by Licensee from Licensor, either in accordance with current practice or as developed in the future.

(5)     Each payment under this paragraph 3.C, except the standard Additional Room Application Fee, shall be accompanied by the monthly statement referred to in paragraph 8.A. Licensor may apply any amounts received under this paragraph 3.C to any amounts due under this License. If any amounts are not paid when due, such non-payment shall constitute a breach of this License and, in addition, such unpaid amounts will accrue interest beginning on the first day of the month following the due date at 1

6

1/2% per month or the maximum interest permitted by applicable law, whichever is less.

(6)    Local and regional marketing programs and related activities may be conducted by Licensee, but only at Licensee's expense and subject to Licensor's requirements. Reasonable charges may be made for optional advertising materials ordered or supplied by Licensor to Licensee for such programs and activities.

(7)    Licensor has the right, in its sole discretion, to require Licensee to tender any payments due to Licensor under this License to Licensor's parents, affiliates, subsidiaries or other designees.

(8)    Licensor shall comply with Licensee's reasonable requirements concerning confidentiality of information.

## 4.    LICENSOR'S RESPONSIBILITIES:

### A.    Training:

During the License Term, Licensor will continue to specify and provide required and optional training services and programs at various locations. A fee may be charged for certain required and optional training services. Travel, lodging and other expenses of Licensee and its employees will be borne by Licensee. Reasonable charges also may be assessed for training materials.

### B.    Reservation Services:

During the License Term, so long as Licensee is in full compliance with its material obligations hereunder, Licensor will afford Licensee access to reservation service for the Hotel on terms consistent with this License.

### C.    Consultation on Operations, Facilities and Marketing:

During the License Term, Licensor will, from time to time at Licensor's discretion, make available to Licensee consultation and advice in connection with operations, facilities and marketing. Licensor may from time to time furnish to Licensee names of suppliers or recommend to Licensee suppliers of goods and services required or useful in the operation of the Hotel; however, Licensor is not obligated to furnish any such names or to continue doing so, and Licensee is under no obligation to use any such supplier, unless expressly required to do so by the terms of this License, the Manual or otherwise. In identifying or recommending suppliers, Licensor exercises its business judgment based on its information as of that date and its sense of the long-term interests of the System. Licensor's identification or recommendation of a supplier is not a warranty of the financial condition or performance of any supplier or of any other factor, and Licensee's use of an identified or recommended supplier that sells products or services meeting Licensor's standards and specifications may facilitate compliance with those standards and specifications, but it is not a substitute for such compliance.

7

CP06

Exhibit 1-Page 39 of 108

### D.    Maintenance of Standards:

Licensor will conscientiously seek to maintain high standards of quality, cleanliness, appearance and service at all hotels using the System so as to promote, protect and enhance the public image and reputation of the Crowne Plaza name and to increase the demand for services offered by the System. Licensor's judgment in such matters shall be controlling in all respects, and it shall have wide latitude in making such judgments.

### E.    Application of Manual:

Licensee's Hotel and all other hotels operated under the System will be subject to the Manual, as it may from time to time be modified or revised by Licensor, including limited exceptions from compliance which may be made based on local conditions, type of hotel or special circumstances. The Manual and any modification to it can be delivered by Licensor to Licensee in hard paper copy or, at Licensor's option, be made available to Licensee in digital, electronic or computerized form. If communicated in digital, electronic or computerized form, Licensee must pay any costs to retrieve, review, use or access the Manual. The Manual is confidential and remains the property of Licensor.

### F.    Other Arrangements for Marketing, Etc.:

Licensor may enter into arrangements for development, reservation services, marketing, operations, administrative, technical and support functions, facilities, programs, services and/or personnel with any other entity, and may use any facilities, programs, services or personnel used in connection with the System, in connection with any business activities of its parents, subsidiaries, divisions or affiliates.

### G.    Licensor's Use of Other Advertising/Promotional Support Funds:

To the extent that advertising and/or promotional support and/or funding may become available to Licensor's parents, affiliates or subsidiaries and/or Licensor from third parties on account of the totality of the activities of Licensor's parents, affiliates and subsidiaries, including hotels operated under the System, such support and/or funding may be used or designated by Licensor's parents, affiliates or subsidiaries, or Licensor, to benefit such enterprises in the aggregate, in such proportion and manner as Licensor's parents, affiliates or subsidiaries, or Licensor determines reasonably promotes the totality of such enterprises, exercising reasonable good faith business judgment with respect to such determination, provided that any such support or funding coming from activities of the System shall be used for the benefit of the System.

### H.    Use of Services Contribution:

Licensor will make available and use Services Contribution funds computed on the basis generally applicable to licensees of the System. Licensor is not obligated to expend funds for marketing, reservations or related services in excess of the amounts received from licensees using the System and those funds made available by Licensor as set forth above. Local and regional marketing programs and related activities may be conducted by Licensee but only at

8

Licensee's expense and subject to Licensor's requirements. Reasonable charges may be made for optional advertising materials ordered or used by Licensee for such programs and activities.

I.    **Performance of Licensor's Obligations:**

Licensee understands and agrees that Licensor, in its sole discretion, may perform any or all of its obligations under this License directly or through Licensor's parents, affiliates, subsidiaries or other designees.

5.    **APPEALS, CHANGES IN THE MANUAL:**

A.    **Appeals:**

Decisions, other than termination notices or decisions of Licensor's Franchise Committee, made on behalf of Licensor specifically with reference to the Hotel may be appealed to Licensor's Franchise Committee if done promptly after Licensee has diligently sought relief through Licensor's normal channels of authority. With the approval in writing of any member of the Franchise Committee, the decision may be further appealed to the Executive Committee of Licensor's Board of Directors.

B.    **Changes in the Manual:**

Each change in the Manual shall be communicated in writing to Licensee at least 30 days before it goes into effect (which communication may be in hard paper copy or, at Licensor's option, in digital, electronic or computerized form, and if such communication is in digital, electronic or computerized form, Licensee must pay any costs to retrieve, review, use or access same). Licensor's Franchise Committee or its equivalent, or designee subcommittee, must approve any such change and must determine that the change was formulated in good faith in the best interests of the System, after seeking the advice and counsel of the Rules of Operation Committee of the IAHI.

C.    **Decisions on Appeal:**

Licensor shall have the right to decide appeals under this paragraph 5, solely on the basis of written submissions. No appeal will suspend a decision or change, until and unless the appeal is successful. Any action taken by Licensor in the enforcement of this License that is shown to be arbitrary or capricious will be rescinded by Licensor to the extent feasible, but wide discretion and latitude will be allowed to the judgment of Licensor in the discharge of its overriding responsibility to maintain and improve the standards, performance and facilities of the hotels using the Crowne Plaza, Crowne Plaza Resort, Crowne Plaza Suites or any other Crowne Plaza hotel brand or Crowne Plaza name. Licensor will conscientiously seek to maintain high standards of quality, cleanliness, appearance and service at all hotels using the System so as to promote, protect and enhance the public image and reputation of all Crowne Plaza hotel brand names or any other Crowne Plaza name, and to increase the demand for services offered by the System. The Manual will apply to all hotels operated under the System by Licensor and its

9

licensees.  Limited exceptions from compliance may be made based on local conditions or special circumstances.

**D.**   **Limitation on Appeal Rights:**

Licensee will not be arbitrary, capricious or unreasonable in exercising its appeal (or any other) rights under this License, and will use them only for the purpose for which intended.

**6.**   **IAHI:**

**A.**   **Membership:**

Licensee, other licensees of the System, and Licensor are eligible for membership in the IAHI and are entitled to vote at its meetings on the basis of one hotel, one vote, provided that Licensee or Licensor, as the case may be, has paid all its dues and fees owing to the IAHI. The purposes of the IAHI will be to consider and discuss, and make recommendations on common problems relating to the operation of System hotels.  Licensor will seek the advice and counsel of the IAHI Board of Directors and its Rules of Operation, Advertising and Reservation Committees, or their successor committees.

**B.**   **Function of Committees:**

IAHI committees, their functions and their members will be subject to approval in writing by Licensor, which approval will not be unreasonably withheld.  Recognizing that the IAHI must function in a manner consistent with the best interests of all persons using the System, the Licensee and Licensor will use their best efforts to cause the governing rules of the IAHI to be consistent with this License.

**7.**   **PROPRIETARY RIGHTS:**

**A.**   **Ownership of System:**

The Licensee acknowledges and will not contest, either directly or indirectly, Licensor's unrestricted and exclusive ownership of the System and any element(s) or component(s) thereof, or that Licensor has the sole right to grant licenses to use all or any element(s) or component(s) of the System.  Licensee specifically agrees and acknowledges that Licensor owns or is licensed to use the marks Crowne Plaza, Crowne Plaza Suites, Crowne Plaza Resort, and all other Marks, as defined in paragraph 7.B below, other elements associated with the System, as defined in paragraph 1.B of this License, or derived therefrom (including but not limited to domain names or other identifications or elements used in electronic commerce), together with the goodwill symbolized thereby, and that Licensee will not contest directly or indirectly the validity or ownership of the Marks either during the term of this License or after its termination.  All improvements and additions whenever made to or associated with the System by the parties hereto or anyone else, and all service marks, trademarks, copyrights, and service mark, trademark, domain name or similar registrations at any time used, applied for or granted in

10

CP06

Exhibit 1-Page 42 of 108

connection with the System, and all goodwill arising from Licensee's use of Licensor's marks shall inure to the benefit of and become the property of Licensor. Upon expiration or termination of this License, no monetary amount shall be assigned as attributable to any goodwill associated with Licensee's use of the System or any element(s) or component(s) of the System including any trademarks or service marks licensed hereunder.

**B.    Trademark Disputes:**

The "Marks" means the names and marks Crowne Plaza, Crowne Plaza Suites, Crowne Plaza Resort, Holidex, and their distinguishing characteristics and the other service marks, trademarks, trade names, slogans, commercial symbols, logos, trade dress, copyrighted material and intellectual property associated with the System, including (without limitation) those which Licensor may designate in the future for use and those which Licensor does not designate as withdrawn from use. Licensor will have the sole right and responsibility to handle disputes with third parties concerning use of all or any part of the Marks or System, and Licensee will, at its reasonable expense, extend its full cooperation to Licensor in all such matters. All recoveries made as a result of disputes with third parties regarding use of the Marks or System or any part thereof shall be for the account of Licensor. Licensor need not initiate suit against alleged imitators or infringers, and may settle any dispute by grant of a license or otherwise. Licensee will not initiate any suit or proceeding against alleged imitators or infringers or any other suit or proceeding to enforce or protect the Marks or System.

**C.    Protection of Name and the Marks:**

Both parties will make every effort consistent with the foregoing to protect and maintain the Marks. Licensee agrees to execute any documents deemed necessary by Licensor or its counsel to obtain protection for the Marks or to maintain their continued validity and enforceability. Licensee agrees to use the Marks associated with the System only in the manner authorized by Licensor and acknowledges that any unauthorized use thereof shall constitute infringement of Licensor's rights.

**D.    Modification or Discontinuation of the Marks:**

If Licensor modifies or discontinues use of any of the Marks licensed under this License as a result of any proceeding or settlement, then Licensee agrees to comply with Licensor's instructions in order to implement such modification or discontinuation. Licensee further agrees that it will have no right to any compensation or other remedies from Licensor or any of its subsidiaries, affiliates or parents as a consequence of any such modification or discontinuation.

**8.    RECORDS AND AUDITS:**

**A.    Monthly Statements:**

At least monthly, Licensee shall prepare a statement which will include all information concerning Gross Rooms Revenue, other revenues generated at the Hotel, room

11

CP06

Exhibit 1-Page 43 of 108

occupancy rates, reservation data and other information required by Licensor that may be useful (in Licensor's sole business judgment) in connection with marketing and other functions of Licensor, its parents, subsidiaries, divisions or affiliates (the "Data"). The Data shall be the property of Licensor. The Data will be permanently recorded and retained by Licensee as may be reasonably required by Licensor. By the third of each month, Licensee will submit to Licensor a statement setting forth the Data and reflecting the computation of the amounts then due under paragraph 3.C. The statement will be in such form (including but not limited to electronic transmission or automatic capture) and detail as Licensor may reasonably request from time to time, and may be used by Licensor for its reasonable purposes.

**B.    Preparation and Maintenance of Records:**

Licensee will, in a manner and form satisfactory to Licensor and utilizing accounting and reporting standards as reasonably required by Licensor, prepare on a current basis (and preserve for no less than 4 years or Licensor's record retention requirements, whichever is longer), complete and accurate records concerning Gross Rooms Revenue and all financial, operating, marketing and other aspects of the Hotel, and maintain an accounting system which fully and accurately reflects all financial aspects of the Hotel and its business. Such records shall include but not be limited to books of account, tax returns, governmental reports, register tapes, daily reports, and complete quarterly and annual financial statements (profit and loss statements, balance sheets and cash flow statements).

**C.    Audit:**

Licensor may require Licensee to have Licensee's Gross Rooms Revenue and/or monies due hereunder computed and certified as accurate by a certified public accountant. During the License Term and for two years afterward, Licensor and its authorized agents will have the right to verify information required under this License by requesting, receiving, inspecting and auditing, at all reasonable times, any and all records referred to above wherever they may be located (or elsewhere if reasonably requested by Licensor). If any such inspection or audit discloses a deficiency in any payments due hereunder, and the deficiency in any payment is not offset by overpayment, Licensee shall immediately pay to Licensor the deficiency and interest thereon as provided in paragraph 3.C(5). Licensee shall also immediately pay to Licensor an audit fee of $3,000. If the audit does not result in a deficiency being assessed, then no audit fee will be assessed. If the audit discloses an overpayment, Licensor will immediately refund it to Licensee.

**D.    Annual Financial Statements:**

Licensee will submit to Licensor as soon as available but not later than 90 days after the end of Licensee's fiscal year, and in a format as reasonably required by Licensor, complete financial statements for such year. Licensee will certify them to be true and correct and to have been prepared in accordance with generally accepted accounting principles consistently applied, and any false certification will be a breach of this License.

12

CP06

Exhibit 1-Page 44 of 108

9.    **INDEMNITY AND INSURANCE:**

    A.    **Indemnity:**

        Licensee will indemnify Licensor, its parents, and its subsidiaries and affiliates and their officers, directors, employees, agents, successors and assigns against, hold them harmless from, and promptly reimburse them for all payments of money (fines, damages, legal fees, expenses, etc.) by reason of any claim, demand, tax, penalty, or judicial or administrative investigation or proceeding whenever asserted or filed (even where negligence of Licensor and/or its parents, subsidiaries and affiliates is alleged) arising from any claimed occurrence at the Hotel or any act, omission or obligation of Licensee or anyone associated or affiliated with Licensee or the Hotel. At the election of Licensor, Licensee will also defend Licensor and/or its parents, subsidiaries and affiliates and their officers, directors, employees, agents, successors and assigns against same. In any event, Licensor will have the right, through counsel of its choice, to control any matter to the extent it could directly or indirectly affect Licensor and/or its parents, subsidiaries or affiliates or their officers, directors, employees, agents, successors or assigns. Licensee agrees to pay Licensor all expenses including attorney's fees and court costs, incurred by Licensor, its parents, subsidiaries or affiliates, and their successors and assigns to remedy any defaults of or enforce any rights under the License, effect termination of the License or collect any amounts due under the License.

    B.    **Insurance:**

        During the License Term, Licensee will comply with all insurance requirements of any lease or mortgage covering the Hotel, and Licensor's specifications for insurance as to the amount and type of coverage as may be reasonably specified by Licensor from time to time in writing, and will in any event maintain on the Hotel as a minimum, the following insurance underwritten by an insurer approved by Licensor:

    (1)    employer's liability with minimum limits of $10,000,000 per occurrence; and

    (2)    worker's compensation insurance; and

    (3)    employment practices liability insurance (including coverage for harassment, discrimination and wrongful termination, and covering defense and indemnity costs) with a limit of $1,000,000 per loss; and

    (4)    the holder of the liquor license will maintain liquor liability insurance with single limit coverage for personal and bodily injury and property damage of at least $10,000,000 for each occurrence naming Licensor and its parents, subsidiaries and affiliates, (and Licensee if applicable) as additional insureds; and

    (5)    commercial general liability insurance, (including coverage for product liability, completed operations, contractual liability, host liquor liability and fire legal liability) and business automobile liability insurance (including hired and non-owned liability) with single-limit coverage for personal and bodily injury and property damage of at least $10,000,000 per occurrence, naming Licensor and its parents, subsidiaries and affiliates as

13

CP06

Exhibit 1-Page 45 of 108

additional insureds. In connection with all construction at the Hotel during the License Term, Licensee will cause the general contractor to maintain commercial general liability insurance (including coverage for product liability, completed operations and contractual liability) and business automobile liability insurance (including hired and non-owned liability) with limits of at least $10,000,000 per occurrence for personal and bodily injury and property damage underwritten with insurers approved by Licensor. Licensor and its parents, subsidiaries and affiliates will be named as additional insureds.

(6)    If multiple locations are insured on policies containing an aggregate limit, then the aggregate limit must apply on a per location aggregate basis.

All policies must be written on a fully insured basis. Deductibles or self-insured retentions are subject to approval on an individual basis.

## C.    Evidence of Insurance:

At all times during the License Term, Licensee will furnish to Licensor certificates of insurance evidencing the term and limits of coverage in force, names of applicable insurers and persons insured, and a statement that coverage may not be canceled, altered or permitted to lapse or expire without 30 days' advance written notice to Licensor. Revised certificates of insurance shall be forwarded to Licensor each time a change in coverage or insurance carrier is made by Licensee, and/or upon renewal of expired coverages. At Licensor's option, Licensee may be required to provide certified insurance policy copies.

## 10.    TRANSFER:

## A.    Transfer by Licensor:

Licensor shall have the right to transfer or assign this License or any of Licensor's rights or obligations hereunder to any person or legal entity.

## B.    Transfer by Licensee:

Licensee understands and acknowledges that the rights and duties set forth in this License are personal to Licensee, and that Licensor has granted this License in reliance on the business skill, financial status, and personal character of Licensee (if Licensee is an individual), and upon the owners, members, partners or stockholders of Licensee (if Licensee is an entity, such as a partnership, company or corporation ("Entity")). Accordingly, neither Licensee nor any immediate or remote successor to any part of Licensee's interest in the License, nor any individual or entity which directly or indirectly owns an Equity Interest (as that term is defined herein) in Licensee or the License, shall sell, assign, transfer, convey, pledge, mortgage, encumber, or give away, any direct or indirect interest in the License or Equity Interest in Licensee, except as provided in this License. Any purported sale, assignment, transfer, conveyance, pledge, mortgage, or encumbrance by operation of law or otherwise, of any interest in the License or any Equity Interest in Licensee not in accordance with the provisions of this

14

CP06

Exhibit 1-Page 46 of 108